LAW OFFICES OF BERNARD D. MORLEY, P. C.; Palace, Inc.; MJL Corporation; Colfax, Inc.; 1661, Inc.; and Evans Venture, Plaintiffs-Appellants,

v.

J. D. MacFARLANE, Attorney General, State of Colorado, and Robert Gallagher, District Attorney, County of Arapahoe; and Sheriff's Department, County of Arapahoe, Defendants-Appellees.

No. 81SA112.

Supreme Court of Colorado,
En Banc.

July 6, 1982.

---

Robert C. Ozer, P. C., Robert C. Ozer, Conifer, for plaintiffs-appellants.

Robert H. Gallagher, Jr., Dist. Atty., Catherine P. Richardson, Deputy Dist. Atty., Littleton, for defendants-appellees.

ERICKSON, Justice.

This appeal was taken from an order denying injunctive relief to the Law Offices of Bernard D. Morley, P. C.; Palace, Inc.; MJL Corporation; Colfax, Inc.; 1661, Inc.; and Evans Venture (Appellants), against the Attorney General of the State of Colorado, the District Attorney of Arapahoe County, Colorado, and the Arapahoe County Sheriff's Department (Appellees). The complaint sought to enjoin the use of materials seized from the law offices of Morley pursuant to a valid search warrant. The warrant was issued as a result of an undercover investigation of Bernard Morley and his client, Harold Lowrie. Neither Morley nor Lowrie is a party to this case. The sole parties seeking injunctive relief pursuant to C.R.C.P. 65 are a professional corporation and a number of corporations which hold liquor licenses and which operate taverns in Colorado. The trial court held that, under the facts of this case, an adversary hearing was not required to determine the applicability of the attorney-client privilege or the work product doctrine to the seized items because the prosecution established a prima facie showing of the applicability of the crime-fraud exception. We affirm.

### I.

The facts of this case are undisputed. On January 26, 1981, Detective Ollila of the Arapahoe County Special Crime Attack Team (SCAT) prepared an affidavit for the issuance of a search warrant for the law offices of appellant, Bernard D. Morley, P. C., in Arapahoe County, Colorado. The affidavit set forth the following facts which formed the basis for Detective Ollila's belief that certain property was located at Morley's law offices which was material evidence relating to alleged violations of the Colorado Criminal Code.

In July 1980, the chief of the Cherry Hills Police Department contacted Detective Ollila and requested an investigation into the possible criminal activity of Morley, who is a registered Colorado attorney. In response to the request, the Arapahoe County SCAT and the Federal Bureau of Investigation conducted a joint undercover investigation of Morley's activities. As part of their investigation, the undercover agents learned that Morley was assisting Lowrie in his alleged illegal control of the ownership of several taverns in Colorado by the use of "sham" corporations for each tavern. The sham corporations had "front" people named as officers or directors of the corporations which obtained Colorado liquor licenses.[1] Morley told the undercover agents that he held the endorsed stock certificates for the various sham corporations and letters of resignation signed by the front men in order to quickly change the management and ownership of the corporations if necessary. Lowrie subsequently confirmed the arrangements he had made with Morley in a conversation with an undercover agent. Thereafter, in a taped conversation with an undercover agent, Morley stated "You don't ever give [the front men] stock certificates. You don't ever give 'em the seal, stock book, minute book, anything. We keep it here." By having a management contract with the record owner of each tavern, and with Morley empowered to change the management at any time, Lowrie was able to completely control the financial operation of not less than five taverns in Colorado.

After obtaining copies of the public corporate records and the applications for liquor licenses for the various taverns, Detective Ollila requested the issuance of a search warrant for Morley's law offices based upon the particular facts set forth in the affidavit relating to Morley's role in the formation of the sham corporations to de-

1. Section 12–47–129, C.R.S. 1973 (1978 Repl. Vol. 5), is "intended to prohibit and prevent the control of the outlets for the sale of alcoholic beverages by any person or parties other than the persons licensed pursuant to the provisions in this article."

fraud the liquor licensing authority.[2] On January 26, 1981, a search warrant was issued authorizing the seizure of various records described as follows:

"Records pertinent to the management and operation of the following businesses; including, . . . financial records, bank deposit slips, bank books, sales records, purchase records, credit invoices, cancelled checks, stockholders and corporate records, stock certificates, employment records, letters of resignation, business ledger books, accounting records, corporate seals, stock books and minute books, and all monies and proceeds from the businesses:

1. INTERNATIONAL ENTERTAINMENT CONSULTANTS, INC.
 1601 West Evans Avenue
 Denver, Colorado
2. EAGLE MANAGEMENT SERVICES, INC.
 1601 West Evans Avenue
 Denver, Colorado
3. PALACE, INC.—Doing Business as "PT's"
 1601 West Evans Avenue
 Denver, Colorado
4. MJL CORPORATION—Doing Business as "PT's OF COLORADO SPRINGS, INC."
 3250 East Platte Avenue
 Colorado Springs, Colorado
5. COLFAX, INC.—Doing Business as "SATURDAYS, INC."
 8315 East Colfax Avenue
 Denver, Colorado
6. SIXTEEN SIXTY ONE, INC.—Doing Business as "BOOGIE DOWN"
 1661 West 64th Avenue
 Denver, Colorado"

The search warrant was executed by the Arapahoe County Sheriff's Department on January 27, 1981, and the client files and corporate books of the appellant corporations were seized from Morley's offices. In this appeal, the appellants do not contest the validity of the affidavit or the search warrant, or the manner in which the warrant was executed.

On January 30, 1981, the appellants filed this action in the District Court in and for the City and County of Denver seeking to enjoin the dissemination of the seized items to state investigators and to a grand jury until the court reviewed the items and determined the applicability of the attorney-client privilege and the work product doctrine as to each document. Pursuant to a stipulation between the parties, the documents and files were deposited with the clerk of the court and were available for viewing only by authorized representatives of the law offices of Morley. The stipulation also required each party to submit written briefs on the scope of the court's review of the seized documents and set forth the procedure to be followed in determining whether a prima facie showing of the crime-fraud exception to the attorney-client privilege and the work product doctrine had been established. At a hearing on February 5, 1981, the district court approved the stipulation.

Thereafter, the court received memoranda of law, held a second hearing on February 13, 1981, and conducted an in camera review of the seized documents. On February 17, 1981, the court ruled that the prosecution had established a prima facie showing of the applicability of the crime-fraud exception to permit the release of the documents seized pursuant to the search warrant. The court also found that all of the seized documents but one file and one pad of blank stock certificates were within the scope of the search warrant. In addition, it determined that none of the documents within the scope of the warrant were protected by the attorney-client privilege because they had been disseminated to third parties. The court also concluded that the documents did not fall within the work product rule since they were not prepared in anticipation of litigation or trial. Ac-

---

**2.** The affidavit alleged second degree forgery, in violation of section 18–5–103, C.R.S. 1973 (1978 Repl.Vol. 8); fraud, in violation of section 39–21–118, C.R.S. 1973; and conspiracy, in violation of section 18–2–201, C.R.S. 1973 (1978 Repl.Vol. 8).

cordingly, the court denied injunctive relief and ordered that the documents, with the above-noted exceptions, be released to the State Attorney General's offices and to the Arapahoe County Sheriff's Department.[3]

## II.

The appellants contend that the trial court erred in not allowing an adversarial hearing in conjunction with the in camera inspection of the seized items prior to the dissemination of the documents. In their view, evidence regarding the attorney-client privilege and the work product doctrine should have been heard by the trial court before a ruling was made on the application for injunctive relief against the use of the seized documents. It is also asserted that the prosecution's prima facie showing of the crime-fraud exception was insufficient to satisfy the requirements of judicial screening of the documents.

Of particular significance in this case is the stipulation between parties regarding the manner in which the injunction issues

would be resolved by the trial judge. The parties agreed that the court would maintain custody of the sealed documents until the issues were resolved. In addition, the stipulation provided that, following submission of the briefs, the court would examine the seized documents to determine if they were within the scope of the search warrant. Thereafter, the court was to determine whether the documents were subject to either the attorney-client privilege or the work product doctrine. Those documents which were not subject to either the attorney-client privilege or the work product doctrine were to be released to the prosecution. The documents which the court determined might fall within either the attorney-client privilege or the work product doctrine were to be suppressed unless the prosecution made a prima facie showing that the crime-fraud exception applied. The parties also agreed that the court had the option of making the determination at either an *ex parte* hearing or at an adversary hearing.[4] From the record and the facts

3. The appellants thereafter petitioned the Supreme Court to stay the district court's order pending appeal or, in the alternative, for a writ of prohibition to the district court requiring it to maintain the corporate files under seal. (S.Ct. No. 81SA62). In an order entered February 19, 1981, the Supreme Court denied the petition.

4. At the hearing on February 5, 1981, the trial judge set forth the following stipulation which was approved by counsel in open court:

THE COURT: "The record should reflect that the Court has conferred informally with counsel for—at length, really,—and the parties now stipulate and agree as follows:

"The status quo of the documents seized from Bernard Morley's law office will be maintained as per the stipulation and order signed by the parties through their attorneys and approved by the Court this date, February 5, 1981. By 5:00 P.M. on Wednesday, February 11th, 1981, both parties will submit written briefs to the Court in duplicate on the scope of the Court's review of the seized documents and the nature and extent of the show cause hearing ... at which the prosecution must establish a prima facie showing that any attorney/client privilege or work product exemption is dissolved by virtue of the application of the criminal purpose exemption to those privileges.

"Following receipt of briefs of both sides as indicated, the Court will then review the seized

documents and determine, in the first instance, if the documents are within the scope of the search warrant.

"The Court will then determine if the attorney/client privilege or the attorney work product exemption applies to any of the seized documents. Those documents which the Court determines are not subject to either the attorney/client privilege or the work product exemption will be ordered released forthwith for use by the prosecution.

"As to those documents which the Court ... determines are subject to the attorney/client privilege or the work product exemption, the Court will then require a prima facie showing by the prosecution that the privilege or exemption is dissolved by virtue of the criminal purpose exemption to the privileges.

"This showing will, itself, be made at an ex parte hearing by the prosecution or at an adversary type hearing at which Plaintiffs' counsel will be present, as the Court so determines.

"And the Court will have a hearing to make that determination, so that all counsel will have an opportunity to present their arguments to the Court in that regard.

"The microfilms that are now in custody of the Court ... will be retained under the Court's jurisdiction and will be subject to such further orders as the Court deems appropriate.

"After the Court has reviewed the seized documents, the Court will then set the matter

which are before us, we conclude that the trial judge did not err in releasing the seized documents without an adversary hearing.

### A.

■ The common law attorney-client privilege has been codified in Colorado in section 13–90–107(1)(b), C.R.S.1973 (1981 Supp.), as follows:

"There are particular relations in which it is the policy of the law to encourage confidence and to preserve it inviolate; therefore, a person shall not be examined as a witness in the following cases:"

\* \* \* \* \* \*

"(b) An attorney shall not be examined without the consent of his client as to any communication made by the client to him or his advice given thereon in the course of professional employment; nor shall an attorney's secretary, paralegal, legal assistant, stenographer, or clerk be examined without the consent of his employer concerning any fact, the knowledge of which he has acquired in such capacity."

It is well-established that the attorney-client privilege exists for the personal benefit and protection of the client who holds the privilege, and that it must be asserted by the client. It extends only to confidential matters communicated by or to the client in the course of gaining counsel, advice, or direction with respect to the client's rights or obligations. *See, e.g., A. v. District Court*, 191 Colo. 10, 550 P.2d 315 (1976), *cert. denied*, 429 U.S. 1040, 97 S.Ct. 737, 50 L.Ed.2d 751 (1977); *Losavio v. District Court*, 188 Colo. 127, 533 P.2d 32 (1975). The work product doctrine is a related but distinct theory which arises out of similar policy interests:

"Generally, the attorney-client privilege protects communications between the attorney and the client, and the promotion of such confidences is said to exist for the benefit of the client. *Losavio v. District Court, supra; Denver Tramway Co. v. Owens*, 20 Colo. 107, 36 P. 848 (1894). On the other hand, the work-product exemption generally applies to 'documents and tangible things . . . prepared in anticipation of litigation or for trial,' C.R.C.P. 26(b)(3), and its goal is to insure the privacy of the attorney from opposing parties and counsel." *A. v. District Court*, 191 Colo. at 25, 550 P.2d at 327.

■ We have recognized, however, that neither the attorney-client privilege nor the work product exemption is absolute. The social policies underlying each doctrine may sometimes conflict with other prevailing public policies and, in such circumstances, the attorney-client privilege and the work product doctrine must give way. *See Losavio v. District Court, supra. See also Clark v. United States*, 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1933). In this regard, the "crime-fraud" or "criminal purposes" exception has developed as a limitation on the applicability of the attorney-client privilege and the work product exemption. The attorney-client privilege has always been subject to the qualification that communications made to an attorney to obtain his advice for the commission of criminal acts are not protected by the privilege. Simply stated, the crime-fraud exception provides that communications between a client and his attorney are not privileged if they are made for the purpose of aiding the commission of a future crime or of a present continuing crime. *Caldwell v. District Court*, Colo., 644 P.2d 26 (1982); *A. v. District Court, supra; Losavio v. District Court, su-*

---

for hearing on the matters covered by the briefs at a date agreeable to all counsel.

"The preliminary injunction scheduled for 1:30 this afternoon is deemed moot by virtue of this stipulation.

[H]ave I correctly dictated the stipulation into the record?"

COUNSEL FOR APPELLANTS: "That sounds fine, Your Honor."

THE COURT: "Okay. And you approve it?"

COUNSEL FOR APPELLANTS: "Oh, Yes."

THE COURT: "Mr. Beckman?"

COUNSEL FOR APPELLEES: "We approve it."

THE COURT: "Mr. Hilton?"

CO-COUNSEL FOR APPELLEES: "Yes, Your Honor."

THE COURT: "All right. The stipulation then is approved and made an order of the Court."

pra. *See also In re September 1975 Grand Jury Term,* 532 F.2d 734 (10th Cir. 1976); *Webb v. State,* 580 P.2d 295 (Alaska 1978).

■ In recognition of the public policy considerations warranting a crime-fraud exception to the attorney-client privilege, we held in *A. v. District Court, supra:*

> "The attorney-client privilege is rooted in the principle that candid and open discussion by the client to the attorney without fear of disclosure will promote the orderly administration of justice. The criminal purpose exception to the privilege grows out of a competing value of our society which is manifested in the rule that 'the public has the right to every man's evidence, particularly in grand jury proceedings.' Consequently, the attorney-client privilege is not absolute." (Citation and footnote omitted.) 191 Colo. at 22, 550 P.2d at 324–25.

*See also Caldwell v. District Court, supra; In re Grand Jury Proceedings (FMC Corp.),* 604 F.2d 798 (3rd Cir. 1979); *Clark v. United States, supra.* In addition, just as the attorney-client privilege may not be abused as a shield for ongoing or future illegal activity, the attorney work product doctrine cannot be allowed to protect the perpetration of wrongful conduct. *See Caldwell v. District Court, supra.* Thus, the principles underlying the crime-fraud exception have also been applied to the work product doctrine:

> "[W]hen the lawyer is consulted, not with respect to past wrongdoing, but to future illegal activities, the privilege is no longer defensible and the crime-fraud exception comes into play.... [T]here is no actual inconsistency in applying the crime-fraud exception to the work product as well as

to the attorney-client privilege. The rationale supporting the exception in both areas is virtually identical. The work product privilege is perverted if it is used to further illegal activities as is the attorney-client privilege, and there are no over-powering considerations in either situation that would justify the shielding of evidence that aids continuing or future criminal activity." (Citation and footnote omitted.) *In re Grand Jury Proceedings (FMC Corp.),* 604 F.2d at 802.

*See also Caldwell v. District Court, supra; Natta v. Zletz,* 418 F.2d 633 (7th Cir. 1969); *Hercules, Inc. v. Exxon Corp.,* 434 F.Supp. 136 (D.Del.1977). In either case, the rationale for excluding such communications from the scope of the attorney-client privilege and the work product exemption is that the policies supporting their existence are inapplicable where the advice and aid sought refer to future wrongdoing rather than to prior misconduct.[5] *Caldwell v. District Court, supra. See also In re Walsh,* 623 F.2d 489 (7th Cir. 1980), cert. denied, 449 U.S. 994, 101 S.Ct. 531, 66 L.Ed.2d 291 (1980); *In re September 1975 Grand Jury Term, supra; 8 J. Wigmore, Evidence,* § 1198 at 573 (McNaughton Rev. 1961); *C. McCormick, Evidence,* § 95 (2 ed. 1972).

In *A. v. District Court, supra,* and again in *Caldwell v. District Court, supra,* we addressed the procedure to be followed in determining whether the crime-fraud exception is applicable to a particular case:

> "[A] judge may order disclosure of the allegedly privileged documents upon a *prima facie* showing that the future crimes exception is applicable.... [T]his *prima facie* showing is 'not tantamount to proof of a prima facie case,' but requires

---

**5.** The Code of Professional Responsibility recognizes the crime-fraud exception to the attorney-client privilege and work product doctrine. DR 4–101 states:

> "(C) A Lawyer may reveal:
>
> \* \* \* \* \* \*
>
> "(2) Confidences or secrets when permitted under Disciplinary Rules or required by law or court order.
>
> "(3) The intention of his client to commit a crime and the information necessary to prevent the crime."

Of course, the lawyer shall not "engage in illegal conduct involving moral turpitude," DR 1–102(A)(3); or "counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent," DR 7–102(A)(7); or "knowingly engage in other illegal conduct or conduct contrary to a Disciplinary Rule," DR 7–102(A)(8). *See also A. v. District Court,* 191 Colo. 10, 550 P.2d 315 (1976).

that there be a showing of 'some foundation in fact' for the alleged illegal conduct.... [T]he trial court may conduct an *in camera* review of the allegedly privileged documents without first requiring a *prima facie* showing if it determines that this would aid its assessment of the privilege's applicability. The ultimate burden is upon the party asserting the exception to the privilege, and it must be demonstrated that the exception applies to each document before that document is stripped of its privilege." *Caldwell v. District Court*, 644 P.2d at 32.

In *Caldwell*, we determined that in order to reconcile "the need for protection of the attorney-client relationship and the competing need to avoid use of that relationship as a shield for the perpetration of wrongful conduct," the quantum of proof required to invoke the crime-fraud exception was "not tantamount to proof of a prima facie case." Rather, we held that a prima facie showing—one which gives a foundation in fact for the assertion of ongoing or future criminal conduct—was sufficient to invoke the applicability of the crime-fraud exception. *Id. Accord In re September 1975 Grand Jury Term, supra* (on a claim of privilege, it is necessary only to demonstrate a potential relationship between the seized documents and the charges under investigation). We approved this lesser burden of proof in recognition of the significant proof problems facing a proponent of the crime-fraud exception. *Id. See also* Note, *The Future Crime or Tort Exception to Communications Privileges*, 77 Harv.L.Rev. 730 (1964); Gardner, *The Crime or Fraud Exception to the Attorney-Client Privilege*, 47 A.B.A.J. 708 (1961).

### B.

 Any search of a law office for client files and materials must be precisely limited and restricted to prevent an exploratory search. It is axiomatic that the confidentiality of the attorney-client relationship must be preserved by protecting the communications, documents, and materials which a client has made available to his lawyer in order to obtain legal advice.

Consequently, there is an enhanced privacy interest underlying the attorney-client relationship which warrants a heightened degree of judicial protection and supervision when law offices are the subject of a search for client files or documents. *See generally*, Bloom, *The Law Office Search: An Emerging Problem and Some Suggested Solutions*, 69 Geo.L.J. 1 (1980). However, judicial decisions regarding the propriety of law office searches and the protections afforded by the attorney-client privilege must be made on an *ad hoc* basis. *See Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). It is therefore within the sound discretion of the trial court to determine whether the prosecution has established a proper foundation in fact for the applicability of the crime-fraud exception and whether the overall search and seizure was conducted in a reasonable manner in view of the enhanced privacy interest. *See In re September 1975 Grand Jury Term*, 532 F.2d 734 (1976). In order to assure that intrusions into client files and materials do not unreasonably interfere with the attorney-client relationship, an adversary hearing is desirable when the attorney-client privilege or the work product doctrine is invoked to bar the dissemination of documents seized as a result of a law office search. In conducting such a hearing, the trial judge is able to rule on the applicability of the attorney-client privilege and the work product doctrine to each document seized, thereby preserving a detailed record for appeal.

 Under the circumstances of this case, however, the trial court did not abuse its discretion by releasing the documents seized from Morley's offices without an adversary hearing. The documents in question were seized pursuant to a search warrant issued by the district court in conjunction with an ongoing investigation of continuing criminal activity which allegedly involved Morley as well as his client. Morley was therefore a target of the investigation, and the search of his offices was specifically designed to obtain evidence of his criminal activities relating to the formation of sham

corporations for fraudulent purposes. *Cf. O'Connor v. Johnson*, 287 N.W.2d 400 (Minn.1979); *Deukmejian v. Superior Court*, 103 Cal.App.3d 253, 162 Cal.Rptr. 857 (1980). *See generally*, Bloom, *The Law Office Search: An Emerging Problem and Some Suggested Solutions*, 69 Geo.L.J. 1 (1980); Gurfein, *The Assault on the Citadel of Privilege Proceeds Apace: The Unreasonableness of Law Office Searches*, 49 Fordham L.Rev. 708 (1981).

Moreover, we are not confronted in this appeal with any claim regarding the reasonableness of the search of Morley's offices in light of the enhanced privacy interest underlying the attorney-client privilege. The appellants do not assert a claim, constitutional or otherwise, directed to the procedures used by the law enforcement authorities to seize the files and documents in issue. The sufficiency or accuracy of the affidavit, the validity of the search warrant, and the manner in which the search warrant was executed are therefore not in issue in this case. *Cf. People v. Hearty*, Colo., 664 P.2d 302 (1982). The sole issue now before us is whether the attorney-client privilege prevents the dissemination of the seized documents.

We do not have the documents before us for review, and we are faced with minimal references in a sparse record regarding the precise nature and content of the documents seized. However, it is clear that before the trial court entered its written order concluding that the prosecution had made a prima facie showing that the crime-fraud exception applied to all the seized documents which were within the scope of the warrant, it reviewed the affidavit for the search warrant and the briefs submitted by the parties, and conducted an in camera review of all the seized documents. The documents which the court determined not to be within the scope of the warrant were then returned to the appellants. The trial court also found that the disclosures by Morley and his client to third parties of the existence of the documents prepared as part of their ongoing scheme to defraud the liquor licensing authority defeated their claim of privilege. In reviewing the totality of the circumstances as shown by the record in this case, including the stipulation and the manner in which the attorney-client privilege and the work product rule has been asserted, we are satisfied that the nexus between the documents seized and the type of ongoing criminal conduct described in the affidavit supports a finding that the crime-fraud exception was applicable to permit the disclosure of the seized documents.

Accordingly, the judgment of the district court is affirmed.

QUINN, J., specially concurs.

QUINN, Justice, specially concurring:

I specially concur in the result. Although the appellants did not specifically assert in their complaint that the search of Morley's law office violated their constitutional rights of privacy under the Fourth Amendment to the United States Constitution and Article II, Section 7 of the Colorado Constitution, they did claim that the search irreparably harmed their "legally protected right to confidentiality of documents protected by [the] attorney-client privilege," and they requested an order enjoining the disclosure of the seized documents to third parties. I do not view the stipulation between the parties as an abandonment of the appellants' request for an adversary hearing but, rather, I interpret it as nothing more than an agreement to submit briefs to the court on the proper procedure to be followed in resolving the appellants' claim for injunctive relief. Given the nature of the appellants' claim and the record before us, I believe the appellants were entitled to at least some form of adversary hearing in order to protect their enhanced privacy interests grounded in the lawyer-client relationship. However, because the seized documents already have been disseminated to law enforcement agencies, granting an adversary hearing at this stage of the proceedings would not undo the disclosures which already have taken place and, for this reason, I believe the judgment of the district court must be affirmed. I write sepa-

rately, however, for two reasons: (1) to point up the need for procedural safeguards, over and above the traditional procedures associated with the issuance and execution of a search warrant, in order to prevent unjustified intrusions, likely to occur during a law office search without these safeguards, upon the privacy interests underlying the lawyer-client relationship; and (2) to explain why I believe that, without these procedural safeguards, a post-seizure adversary hearing on the crime-fraud exception does not, by itself, adequately protect the constitutional right of privacy implicated by the law office search.

## I.

The search of a lawyer's office for client files poses a special threat to the confidentiality of the attorney-client relationship because it circumvents the assertion of the attorney-client privilege, thereby exposing normally unobtainable information to the police. *See Bloom, The Law Office Search: An Emerging Problem and Some Suggested Solutions,* 69 *Geo.L.J.* 1 (1980); Note, *The Assault On the Citadel of Privilege Proceeds Apace: The Unreasonableness of Law Office Searches,* 49 *Fordham L.Rev.* 708 (1981). Putting aside any potential incursion upon the privilege against self-incrimination that might result from such searches, *see Fisher v. United States,* 425 U.S. 391, 416, 96 S.Ct. 1569, 1583, 48 L.Ed.2d 39, 58 (1976) (Brennan, J., concurring), the unmonitored search of a lawyer's office endangers the privacy interest not only of those clients against whom the search is directed but also the privacy interest of other clients not under investigation who have made confidential disclosures to the attorney.

Law enforcement officers executing a search warrant in a lawyer's office likely will find it necessary to peruse miscellaneous papers in attempting to locate the materials sought. Even when documents are located, there still might be other entries in the documents which are immune to disclosure under an applicable privilege. Furthermore, any client may have his file

seized under the plain view doctrine, which only requires that there be a reasonable nexus between the documents seized and criminal behavior. *E.g., Coolidge v. New Hampshire,* 403 U.S. 443, 464–72, 91 S.Ct. 2022, 2037–42, 29 L.Ed.2d 564, 581–87 (1971); *People v. Franklin,* 640 P.2d 226 (Colo.1982). A law office search, without special protective procedures, will inevitably cause a chilling effect on attorney-client communications and pose a significant threat to a client's constitutional right to the effective assistance of counsel guaranteed by the United States and Colorado Constitutions. *U.S.Const.* Amend. VI; *Colo.Const.* Art. II, Sec. 16; *see Weatherford v. Bursey,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977).

The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law. 8 *J. Wigmore, Evidence* § 2290 (J. McNaughton rev. ed. 1961). Its purpose is to encourage full and frank communications between attorneys and their clients in order to promote the broader public interests involved in the administration of justice. Such interests include preserving the dignity of the individual by assuring that he is given protective rights against the power of the state. Thus, "[t]he privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer being fully informed by the client." *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584, 591 (1981). The privilege rests on the need for the lawyer "to know all that relates to the client's reasons for seeking representation if the attorney's professional mission is to be carried out." *Trammel v. United States,* 445 U.S. 40, 51, 100 S.Ct. 906, 913, 63 L.Ed.2d 186, 195 (1980).

Our legislature has recognized the enhanced privacy interest inherent in the attorney-client relationship. Section 13–90–107(1)(b), C.R.S. 1973 (1981 Supp.), includes the attorney-client relationship within that special category of relations "in which it is the policy of the law to encourage confi-

dence and to preserve . . . inviolate" communications made in the course thereof. The privilege extends to all information conveyed by both individual and corporate clients to the attorney in confidence for the purpose of obtaining legal advice. *Upjohn Co. v. United States, supra.* The inviolability of the privilege is particularly significant in criminal prosecutions where the constitutional right to counsel necessarily includes a right to confer in private with one's attorney. *Geders v. United States,* 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976).

The devastating effect of a law office search is all too apparent when the target of the search is a law office which engages in the representation of the criminally accused. Criminal defense work, by definition, involves litigation in which the government itself is the adversary. Under such circumstances nothing less than a scrupulous avoidance of all unnecessary intrusions into confidential communications by governmental agents is absolutely essential to the integrity of the lawyer-client relationship.

The United States Supreme Court has recognized that the constitutional requirements of reasonableness well might vary with the privacy expectations affected by a search. For example, a warrant "sufficient to support the search of an apartment or an automobile [would not necessarily] be reasonable in supporting the search of a newspaper office." *Zurcher v. Stanford Daily,* 436 U.S. 547, 569–70, 98 S.Ct. 1970, 1983, 56 L.Ed.2d 525, 544 (1978) (Powell, J., concurring); *see also Michigan v. Tyler,* 436 U.S. 499, 506, 98 S.Ct. 1942, 1948, 56 L.Ed.2d 486, 496 (1978) ("[t]he showing of probable cause necessary to secure a warrant may vary with the object and intrusiveness of the search"). In *Andresen v. Maryland,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), the Court referred to the enhanced privacy interests attaching to private papers:

"We recognize that there are grave dangers inherent in executing a warrant authorizing a search and seizure of a person's papers that are not necessarily present in executing a warrant to search for physical objects whose relevance is more easily ascertainable. In searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized. Similar dangers, of course, are present in executing a warrant for the 'seizure' of telephone conversations. In both kinds of searches, responsible officials, including judicial officials, must take care to assure that they are conducted in a manner that minimizes unwarranted intrusions on privacy." 427 U.S. at 482, n.11, 96 S.Ct. at 2749, n.11, 49 L.Ed.2d at 643, n.11.

We recently echoed this same theme, in the specific context of the search of a lawyer's office, in *People v. Hearty,* 644 P.2d 302, 313 (Colo.1982), where we stated:

"We believe that rigid adherence to the particularity requirement is appropriate where a lawyer's office is searched for designated documents. Anything less than a strict limitation of the search and seizure to those documents particularly described in the warrant could result in a wholesale incursion into privileged communications of a highly sensitive nature. Once the privileged communication is revealed to the police, the privilege for all practical purposes has been lost."

Because of the enhanced privacy interest which is undercut by the search of a lawyer's office, the Supreme Court of Minnesota has held that where an attorney is not suspected of criminal wrongdoing and there is no threat that documents pertaining to a client will be destroyed, a warrant authorizing the search of a lawyer's office is *per se* unreasonable and, instead, a subpoena *duces tecum* must be served upon the attorney. *O'Connor v. Johnson,* 287 N.W.2d 400 (Minn.1979). This procedure, however, entails the risk of loss or destruction of potential evidence, especially when the attorney might not be a totally blameless third par-

ty, and for this reason I would not mandate it at this time.[1] Rather, where presumptively privileged materials are sought to be seized, I believe the same policy concerns which guided our recent decision in *People v. Hearty, supra*, are applicable here. In my view, strict adherence to the following procedures by judges issuing search warrants will afford adequate protection to the privacy interests endangered by the search of a lawyer's office and at the same time will accommodate the legitimate needs of law enforcement in criminal investigations.[2]

The warrant should describe the material sought with a heightened degree of particularity commensurate with information known to the officers at the time the warrant is sought. *See People v. Hearty, supra*. Greater specificity in drafting will reduce the risk that officers executing the warrant will need to examine unrelated

1. In reversing a federal district court's ruling which prohibited the issuance of search warrants against third parties and required a subpoena *duces tecum* as a constitutional preference, the Supreme Court in *Zurcher v. Stanford Daily*, 436 U.S. 547, 560–61, 98 S.Ct. 1970, 1979, 56 L.Ed.2d 525, 538–39 (1978), stated:
 "In any event, the reasons presented by the District Court and adopted by the Court of Appeals for arriving at its remarkable conclusion do not withstand analysis. First, as we have said, it is apparent that whether the third-party occupant is suspect or not, the State's interest in enforcing the criminal law and recovering the evidence remains the same; and it is the seeming innocence of the property owner that the District Court relied on to foreclose the warrant to search. But, as respondents themselves now concede, if the third party knows that contraband or other illegal materials are on his property, he is sufficiently culpable to justify the issuance of a search warrant. Similarly, if his ethical stance is the determining factor, it seems to us that whether or not he knows that the sought-after articles are secreted on his property and whether or not he knows that the articles are in fact the fruits, instrumentalities, or evidence of crime, he will be so informed when the search warrant is served, and it is doubtful that he should then be permitted to object to the search, to withhold, if it is there, the evidence of crime reasonably believed to be possessed by him or secreted on his property, and to forbid the search and insist that the officers serve him with a subpoena *duces tecum*.
 "Second, we are unpersuaded that the District Court's new rule denying search warrants against third parties and insisting on subpoenas would substantially further privacy interests without seriously undermining law enforcement efforts. Because of the fundamental public interest in implementing the criminal law, the search warrant, a heretofore effective and constitutionally acceptable enforcement tool, should not be suppressed on the basis of surmise and without solid evidence supporting the change. As the District Court understands it, denying third-party search warrants would not have substantial adverse effects on criminal investigations because the nonsuspect third party, once served with a subpoena, will preserve the evidence and ultimately lawfully respond. The difficulty with this assumption is that search warrants are often employed early in an investigation, perhaps before the identity of any likely criminal and certainly before all the perpetrators are or could be known. The seemingly blameless third party in possession of the fruits or evidence may not be innocent at all; and if he is, he may nevertheless be so related to or so sympathetic with the culpable that he cannot be relied upon to retain and preserve the articles that may implicate his friends, or at least not to notify those who would be damaged by the evidence that the authorities are aware of its location. In any event, it is likely that the real culprits will have access to the property, and the delay involved in employing the subpoena *duces tecum*, offering as it does the opportunity to litigate its validity, could easily result in the disappearance of the evidence, whatever the good faith of the third party."

2. Because those aggrieved by the search of a lawyer's office are often third parties, I see no reason to distinguish, for purpose of the procedures described herein, between a law office search involving an attorney suspected of involvement in criminal activity and an attorney who is not.
 "The mere fact that in *Andresen* [*v. Maryland*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976)] and *Burrows* [*v. Superior Court*, 13 Cal.3d 238, 118 Cal.Rptr. 166, 529 P.2d 590 (1974)] both attorneys were charged with crimes creates a distinction without a difference when we are dealing with considerations affecting privileged material. An attorney suspected of criminal activity should have the same concerns about the confidentiality of files containing privileged matter as an innocent third party attorney who allegedly possesses and controls files containing evidence of criminal conduct." *Deukmejian v. Superior Court of Los Angeles*, 103 Cal. App.3d 253, 260, 162 Cal.Rptr. 857, 862 (1980).

files and documents. Such catch-all or omnibus phrases as "any and all records" pertaining to a class of persons or even to a particular person simply are too broad to satisfy the constitutional requirement of particularity.[3] Only where it is not possible to describe files and documents by caption, title, date or time frame, author, recipient or similar identifying characteristics, either because that information is unknown to the officers or is not present on the materials sought, should resort be had to such generic descriptions as "real estate records" or "income tax records" and, in these instances, the records must be expressly confined to a specified person and transaction.

Additionally, the issuing judge should incorporate into the face of the warrant clearly worded directions governing the execution of the search itself. If the papers sought are readily identifiable by a cursory examination of an outside folder or container, the warrant should require the executing officer to seize and seal the papers once located without any further examination of their contents. On the other hand, if the papers sought cannot be identified without examining their contents or the contents of other documents, the warrant should restrict the executing officer to such examination only as necessary to properly identify the papers as within the scope of the warrant and, when so identified, the warrant should require the officer to seize and seal the documents. The warrant should further direct that upon completion of the search a copy of the warrant and a copy of the inventory of property taken

must be given to the attorney whose office was searched and, in the event the attorney is not present, copies should be left at his office. The officer executing the warrant should also be required to deposit forthwith with the issuing judge all documents seized and sealed during the execution of the warrant and to file a written inventory of all property taken during the search. See Model Code of Prearraignment Procedure § 220.5 (1975).

After execution of the warrant the court without unnecessary delay should notify the attorney whose office was searched of the seizure, and also should provide an opportunity to examine the documents and file a motion for the return of any documents on the ground that the search and seizure violated his constitutional privacy interests or those of his clients. Upon the filing of the motion for the return of documents, the court should set the matter for a hearing and permit the attorney to present evidence and argument in support of the motion. Only if the court upholds the search and seizure as constitutional should it then consider whether the seized documents might appropriately be disclosed to law enforcement authorities by reason of the crime-fraud exception. Here again, the attorney should be permitted to present evidence and argument on the applicability of the attorney-client privilege and the crime-fraud exception to the seized documents.

These procedures are necessary to adequately protect those legitimate expectations of privacy which are inherent in the

---

**3.** See United States v. Abrams, 615 F.2d 541 (1st Cir. 1980) (warrant authorizing seizure of "certain business and medical records of patients ... which show actual medical services performed and fraudulent services claimed to have been performed in a scheme to defraud the United States and to submit false medicare and medicaid claims for payments" was unconstitutionally overbroad because there was no description of specific records to be seized or the time frame to which the records pertained); In Re Lafayette Academy, 610 F.2d 1 (1st Cir. 1979) (warrant authorizing seizure of books, papers, letters, correspondence and many other types of documents from a vocational home-study school participating in federally insured student loan program, in connection with an investigation of possible fraudulent practices, was unconstitutionally overbroad because the precise nature of the investigated offenses was not delineated and no effort was made to narrow the documents by category, time period or the like); Burrows v. Superior Court of San Bernardino County, 13 Cal.3d 238, 529 P.2d 590, 118 Cal.Rptr. 166 (1975) (warrant authorizing search of attorney's office and seizure of "all books, records, accounts and bank statements and cancelled checks of the receipt and disbursement of money and any file or documents referring to [particular clients]" was unconstitutionally overbroad because it imposed no meaningful restrictions upon the objects to be seized).

lawyer-client relationship and which, I believe, are entitled to enhanced protection under Article II, Section 7 of the Colorado Constitution, if not also under the Fourth Amendment to the United States Constitution.

## II.

Without these procedural safeguards I believe that a post-seizure adversary hearing, devoted exclusively to the application of the crime-fraud exception to the seized materials, is not by itself adequate to the task of safeguarding the constitutional right of privacy implicated by the search of a lawyer's office. The crime-fraud exception is a rule of evidentiary admissibility which is designed for resolving whether confidential information disclosed by a client to an attorney is nonetheless subject to testimonial disclosure in the course of a judicial proceeding,[4] or during the pretrial discovery phase of litigation.[5] In contrast,

the right to be free against an unlawful search or seizure is constitutional in origin and is designed to prevent improper investigatory tactics by eliminating the incentive for them. *See generally*, 1 *W. LaFave, Search and Seizure* § 1.1 (1978). Central to a determination of whether an unlawful seizure has occurred is whether the aggrieved party has a reasonable expectation of privacy in the area searched or the materials seized. *See, e.g., Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

The focus of inquiry under the crime-fraud exception is not upon the constitutional significance of the manner in which the evidence was acquired, nor upon the significance of the disclosure to the underlying constitutional interests of those about to be aggrieved by the disclosure. Rather, the inquiry is limited to whether a particular communication satisfies the evidentiary features of the exception. The standards of

4. In *A v. District Court*, 191 Colo. 10, 550 P.2d 315 (1976) we examined the crime-fraud exception in the context of the disclosure of subpoenaed documents to a grand jury and stated:
 "The attorney-client privilege is rooted in the principle that candid and open discussion by the client to the attorney without fear of disclosure will promote the orderly administration of justice.... The criminal purpose exception to the privilege grows out of a competing value of our society which is manifested in the rule that 'the public has the right to every man's evidence, particularly in grand jury proceedings.' "
 \* \* \* \* \* \*
 "We recognize that before the privilege can be 'driven away' there must be 'something to give colour to the charge.' The 'prima facie evidence' mentioned in *Clark v. United States*, 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1932), is not tantamount to proof of a prima facie case. It means in the present situation that there must have been some foundation in fact for the charge of conspiracy to steal confidential medical records—the very matter which the grand jury was investigating—before the documents were admitted in evidence in the grand jury proceeding." 191 Colo. at 22, 23, 550 P.2d at 324, 325 (quoting *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972)).
 In establishing standards for determining whether the crime-fraud exception applies in the context of the subpoena of assertedly privileged documents, federal courts have differed over the procedures required. *Compare In Re*

*September 1975 Grand Jury Term*, 532 F.2d 734 (10th Cir. 1976) (no adversary hearing required on question of whether claim of privilege precludes grand jury examination of subpoenaed documents) *with In Matter of Grand Jury Empanelled February 14, 1978*, 603 F.2d 469 (3d Cir. 1979) (attorney permitted to testify *in camera* on facts establishing privilege under judicially-created use immunity) *and In Matter of Walsh*, 623 F.2d 489 (7th Cir. 1980) *cert. denied* 449 U.S. 994, 101 S.Ct. 531, 66 L.Ed.2d 291 (1980) (court approved *in camera* proceeding where "the underlying facts demonstrating the existence of the privilege may be presented only by revealing the very information sought to be protected by the privilege").

5. Recently, in *Caldwell v. District Court*, Colo., 644 P.2d 26 (Colo.1982), we examined the applicability of the crime-fraud exception to material evidencing an attorney's involvement in civil fraud, in the context of a request for production of documents in the possession of the attorney. We held that the privilege gives way where civil fraud is alleged and the proponent of the crime-fraud exception makes a showing that there is "a factual basis adequate to support a good faith belief by a reasonable person that wrongful conduct sufficient to invoke the crime or fraud exception to the attorney-client privilege has occurred." 644 P.2d at 33. The applicability of the crime-fraud exception was relevant to the discoverability of material in *Caldwell* because C.R.C.P. 26(b)(1) limits discovery to matters "not privileged."

evidentiary admissibility, however, are not a proxy for constitutional rights. Evidence otherwise competent and relevant nonetheless might be subject to exclusion because of the manner in which it was acquired by governmental agents.

Being an evidentiary exception to a testimonial privilege, the crime-fraud exception simply does not address the constitutional dimensions of the problems underlying the search of a lawyer's office. For example, the exception has no bearing on the question whether an affidavit establishes probable cause to search in the first instance. Also, the timing of the hearing, which necessarily takes place subsequent to the seizure of the documents, renders it impossible to safeguard against the indiscriminate examination of purportedly privileged documents during the search. Furthermore, the narrow evidentiary character of a hearing offers no opportunity to those aggrieved by the search to contest the truthfulness of the affidavit or the validity of the search and seizure conducted under the warrant. If the affidavit in support of the warrant fails to establish probable cause or is false, or if documents are seized in an unconstitutional manner, then any disclosure of the documents necessarily undercuts the privacy interest of those persons to whom the documents relate. Even the granting of a motion to suppress the seized evidence in the course of later proceedings is hardly an effective remedy to restore the confidentiality of those communications which long since have been disclosed to third parties. Before the application of the crime-fraud exception is ever considered by the court, those persons aggrieved by a law office search must be afforded an opportunity to raise and have resolved the constitutional propriety of the search and seizure in the first instance. Only if the search and seizure are constitutionally upheld, should an adversary hearing on the applicability of the attorney-client privilege and the crime-fraud exception come into play.

I believe that without the imposition of the previously described safeguards relating to the issuance and execution of the search warrant, and the post-seizure constitutional hearing on the propriety of the search and seizure, an adversary hearing on the crime-fraud exception, by itself, does not provide protection to the privacy interest threatened by the search of a lawyer's office for client files. Because the documents seized in this case have already been distributed to law enforcement officers, no purpose is served by remanding the case to the district court for further proceedings and, accordingly, I concur in the affirmance of the judgment.